### STEPHEN DODD & others *vs.* GLOUCESTER MUTUAL FISHING INSURANCE COMPANY.

Essex. Nov. 5, 1875; Jan. 24, 25. — Sept. 8, 1876.

The by-laws of a mutual insurance company provided that each stockholder should furnish vessels to be insured, the amount of insurance of which should be at least seven eighths of the amount of stock subscribed by him ; and that, should he fail to comply with this requirement, he should be held to pay the lowest rate of premium on such sum as should make the required amount; that "all applications for insurance shall be made in writing and signed by the person or agent making such application, and shall specify the amount on the vessel and outfits separately, insurance to commence on the date of the application, and shall be binding on both parties until action is taken upon said application by the directors at their next meeting, and until the expiration of the policy, unless disapproved by the directors at that meeting, notice of such disapproval to be given to the applicant immediately after such action ;" and that " the policy of any vessel insured in this office, in case of the non-arrival of such vessel November 30, at 12 o'clock, noon, may be continued until her arrival at G. Application for the extension of such policy being made by the parties insured, the directors to decide how much extra premium shall be charged and paid for such extension." On December 2, 1871, the company had insured a vessel and outfits on a voyage, the risk to terminate on her arrival at G. The vessel arrived at G. in January, 1872, and on November 30, 1872, was on a voyage, on which she was afterwards lost. In an action against the company for the loss of the vessel, the declaration contained a count alleging that on November 30, 1872, the defendant insured the vessel until her return to port; and also a count on the policy of December 2, 1871, with an allegation that the defendant on November 30, 1872, the vessel being absent, agreed to treat that policy as a policy for the season ending that day, with the right to have it extended until the return of the vessel, and did extend it and continue the risk until the vessel should return to port. The evidence of the plaintiff tended to show that in the morning of November 30, 1872, the secretary of the defendant had an interview with the plaintiff, and asked him what vessels he had out, and was told that this vessel was out, the plaintiff supposing that it was insured on a season policy expiring that day ; the plaintiff also produced the policy of December 2, 1871, on the back of which was printed, "Expires Nov. 30, 1872," but did not open the policy ; the secretary inquired if he wished the policy extended, and the plaintiff replied that he wanted it extended, wanted the amount insured until the vessel came home, or words to that effect; and the secretary said that he would attend to it, and see the entries made and insurance effected. A few days after this the secretary told the plaintiff the vessel was in-

sured, and in December the president of the company told him the vessel being out prevented the settlement of the business of the year, which closed November 30; but in January, the president told the plaintiff that on examination he found that the vessel was not insured. A printed form of application, on which was also a list of the directors printed, on the application book of the company, was signed by the secretary on November 30, 1872, in behalf of the plaintiff, and the blanks for the date and name of the vessel filled; but the other blanks, left for the value of the vessel and the amount insured, were not filled. The amount of insurance which the plaintiff was entitled to, under his subscription to the stock, was not exhausted on November 30, 1872, and enough remained to insure the vessel until her return to port. *Held,* that on this evidence the jury would be warranted in inferring that a valid contract of insurance existed between the plaintiff and the defendant at the time of the loss.

CONTRACT. The declaration contained two counts. The first count alleged that the defendant, on November 30, 1872, insured the plaintiffs on their schooner, the W. J. Dale, on a fishing voyage, until her return to port. The second count alleged that the defendant had, on December 2, 1871, made a policy of insurance upon that vessel, on a fishing voyage, to terminate on her arrival in port; that she had arrived in port, sailed again on a fishing voyage in October, 1872, and, being absent, the defendant, on November 30, 1872, agreed to treat that policy as a policy for the fishing season ending November 30, 1872, with the right to have it extended until the return of the vessel, and did on that day extend and continue the contract until the vessel should return to port. Trial in the Superior Court, before *Allen,* J., who ordered a verdict for the defendant, and reported the case to this court in substance as follows:

James G. Tarr, one of the plaintiffs, testified that his firm had been in the fishing business since 1859, and had been members of the defendant corporation every year since that date; that in the forenoon of November 30, 1872, Cyrus Story, the secretary of the defendant, called at the counting room of the plaintiffs and asked how many vessels they had out at that time; that the witness replied that there were out, the E. K. Parker, the B. D. Haskins and the W. J. Dale; that Story asked where they were, and the witness told him where each was at the last intelligence, the Dale being at Newfoundland for herring; that the witness stepped to the safe, took out their file of policies, selected the three for the vessels named and laid them on the desk before Story, folded; that on the back of the policy issued December

2, 1871, was the printed indorsement, "Expires Nov. 30th, 1872," and this was exposed to view as the policies were folded and filed; that the policies were not opened by either party; that Story asked the witness, "Do you want these policies extended?" and the witness replied, "Yes, we want them extended; we want these amounts insured until they come home," or words to that effect or substance; that Story said that it was part of his business, that he would attend to it and see the entries made and insurance effected; and that he made some memoranda in a small book, which the witness did not see; that in the latter part of December, 1872, or early in January, 1873, he met Mr. Proctor, president of the defendant corporation, in the street, and that Proctor inquired if he had heard anything about the W. J. Dale, to which he replied in the negative; that Proctor said he was sorry, as the office was obliged to keep its settlement with the stockholders open on her account.

On cross-examination, the witness said that his firm had subscribed for $40,000 of stock for the year 1871–1872, and given their notes with sureties as required; that the business of the company is closed, or supposed to be closed, on the 30th of November of each year, except in regard to vessels not then arrived; that there was enough of the subscription unapplied to cover the W. J. Dale if need be, or could be, so applied; that the Dale returned from her Newfoundland trip in January, 1872; that she sailed again and returned in the summer, and again sailed and returned in October, in which month she sailed again to Newfoundland, for herring; that she had fully performed the voyage specified in the policy of December 2, 1871, and brought her cargo to Gloucester; that, at the time of the conversation with Story, he supposed and had always supposed that the Dale was insured, by the season, by an annual policy; that every other vessel of the plaintiffs was so insured for the season ending November 30, 1872; that he understood at the time that he was applying for an extension on the Dale, as on the other vessels, as an extension of the existing policies; that he intended insurance for the voyage which she was on by extension and a premium for that.

On reëxamination, the counsel for the plaintiff was allowed to ask the witness, "Had you any other reason for supposing her

to be insured for the season, and not for the trip, excepting the indorsement on the back of the policy?" To which he replied: "Because of her employment and of the practice of the company, and the indorsement, no doubt, led to my not opening and examining the policies."

Stephen Dodd, another of the plaintiffs, testified that soon after November 30, 1872, he went to the defendant's office, looked over the application book, and saw that the applications for the three vessels had been entered on November 30, but did not notice their phraseology as to extension; that after that he met both Story and Proctor, at different times, and each asked if the Dale had been heard from, and said that they wished to close the office; that after the middle of January, Proctor came to his house, and informed him that upon examination he had found that the Dale was not insured; that the witness said they considered her insured, and Proctor said the company would dispute it.

It appeared that the plaintiffs, before November 30, 1872, had subscribed for $25,000 stock for the year 1872–1873, and given their notes as required; that in the course of the year they took insurance to the full amount by applications subsequent to November 30, 1872.

David Tarr, another of the plaintiffs, testified that a day or two after November 30, he called at the defendant's office, and asked Story if the Dale was insured, and Story replied, "All right, she is insured;" that subsequently, on two occasions, Proctor told him that all the other vessels insured by them had been heard from, except the Dale, and wished to know where she was, as they desired to close up the business of the office, and, on one of those occasions, he asked the witness to telegraph to a certain point, to inquire for her.

It was admitted, if competent, that Story and Proctor, at various times between November 30, 1872, and January 15, 1873, informed other members of the company that the non-arrival of the Dale delayed the adjustment of the business of the company for the year ending November 30, 1872, and that these statements were made in answer to inquiries by persons interested.

It did not appear that anything was done between the plaintiffs and the defendant, between November 30 and the notice to

the plaintiffs, after January 15, as to fixing any premium, or as to applying the alleged insurance to any particular subscription of stock.

All the evidence of conversations and declarations was admitted against the objection of the defendant.

The declaration and answer, the application and policy of December 2, 1871, the application of November 30, 1872, and the applications and policies for the schooners E. K. Parker and B. D. Haskins, and the by-laws, were made parts of the report.

The application of December 2, 1871, was as follows:

" No. 43.  Vessel $5,000.  Outfits $500.  The undersigned this day makes application to have fifty hundred dollars insured on 7-8 of the schooner W. J. Dale, 69.72 tons burthen        years old, whereof        is master.  Employed in the trip to Newfoundland. . Whole vessel valued at sixty hundred dollars. Also, on outfits, five hundred dollars.

" Dodd, Tarr & Co., by C. W.
" Gloucester, Dec. 2, 1871."

[Then followed the names in print of Joseph O. Proctor and nine other directors, with the word " Yes " written after Proctor's name.]

The policy dated December 2, 1871, for a premium of five per cent., insured the plaintiffs fifty hundred dollars on the schooner W. J. Dale, and five hundred dollars on the outfits, " for a voyage from Gloucester to Newfoundland, from thence to a port of discharge of cargo of herring at some point north of Cape Henry, and thence back to Gloucester."  " Commencing this day, and terminating *on arrival of vessel at Gloucester as aforesaid*.  And to be iusured in the manner prescribed by the by-laws, and to be subject to all the restraints and liabilities therein set forth."  The words printed in italics were in the original policy written above the printed words, " the thirtieth day of November next, at noon," and these printed words were erased. The policy also contained the printed clause: " In case of the non-arrival of the vessel November 30th, this policy can be continued on application to the directors, and a rate per cent. to be paid for such continuance being agreed upon."

The application of November 30, 1872, was as follows :

" No. ——.  The undersigned this day makes application to have extension of policy of the schooner W. J. Dale,
tons burthen          years old, whereof          is master.  Employed in the          Whole vessel valued at          hundred dollars.  Also, on outfits,          hundred dollars.

" Dodd, Tarr & Co. pr C. S.

" Gloucester, Nov. 30, 1872."

[Then followed, in print, the names of the ten directors of the defendant company.]

This application was a printed form, and all was in print except the date, the words " extension of the policy," the name of the vessel and the signature.

The applications for insurance and for the extension of the insurance on the other two vessels were similar to those in the case of the W. J. Dale, the blanks in the applications for extension not being filled out.  The policy issued on the E. K. Parker was dated April 6, 1872, and terminated " the 30th day of November next, at noon."  The policy issued on the B. D. Haskins was dated December 20, 1871, and terminated " the 30th day of November next, at noon."

The by-laws of the defendant company, so far as material, are printed in the margin.*

---

* Article 1.  This company shall be governed by a board of ten directors to be chosen at the annual meeting, from the stockholders, one of which shall be chosen by the directors, to act as president, and another to act (in absence of the president) as vice president, whose duties shall be to preside at all meetings of the board, or of the stockholders, and to perform such other duties as may be required of them.  The directors shall have power to appoint a secretary and a treasurer, and fix the amount of salary to be paid to each.

Article 2.  The president and directors shall superintend the concerns of the company, and have the management and direction of all things not otherwise herein provided for.

Article 3.  The secretary shall keep the books and accounts, shall collect and receive all moneys, and pay the same over to the treasurer as soon as received; shall fill up and record all policies and orders, notify meetings, and perform such other duties of the office as the president and directors may require.

Article 6.  All applications for insurance shall be made in writing and signed by the person or agent making such application, and shall specify the amount

If, upon so much of the foregoing evidence as this court should deem competent, the plaintiffs were entitled to go to the jury,

---

on the vessel and outfits separately, insurance to commence on the date of the application, and shall be binding on both parties until action is taken upon said application by the directors at their next meeting, and until the expiration of the policy, unless disapproved by the directors at that meeting ; notice of such disapproval to be given to the applicant immediately after such action.

Article 8. The stock of this company shall be held in shares of one thousand dollars each; for each of which shares a note shall be given for two hundred dollars, payable on demand when required for the use of the company, to be assessed in such sums as may from time to time be required; and each stockholder shall give such security to the company as shall be satisfactory to the directors.

Article 9. All stock notes shall be signed and indorsed before any application for insurance can be received.

Article 10. Any responsible person may take one share of the stock of the company who has property to the amount of one thousand dollars to be insured, and one share for every additional thousand dollars he has to be insured; and for the accommodation of the smaller interests, half shares of stock may be taken upon the same principle.

Article 11. After the closing of the stock book, no person shall retire from the company or cease to be a member thereof, but shall be firmly held until the business of the company for the year shall be settled.

Article 12. Rates of premium and all other matters relating to the government of the company shall be decided by the directors in all cases where they are not instructed by the stockholders at a regularly notified meeting.

Article 22. Each and every stockholder shall furnish vessels to be insured, the amount of insurance of which shall be at least seven eighths of the amount of stock subscribed by him; should he fail to comply with the above requirement, he shall be held to pay the lowest rate of premium on such sum as shall make the required amount.

Article 34. The rates of premium for the current year, (to commence on the date of the application,) shall be as follows :

From November 20 to November 30 of the next year, 9 per cent.

From December 14 to November 30 of the next year, 8 per cent.

From January 1 to November 30 of the same year, 7 per cent.

From January 15 to November 30 of the same year, 6½ per cent.

From February 1 to November 30 of the same year, 6 per cent.

From March 1 to November 30 of the same year, 5½ per cent.

From April 1 to November 30 of the same year, 5 per cent.

From May 15 to November 30 of the same year, 4½ per cent.

From July 1 to November 30 of the same year, 4 per cent.

Two per cent. extra to be added to the premium of any vessel engaged in the Newfoundland fisheries between the 20th of November and the 1st of

the verdict was to be set aside; otherwise, judgment for the defendant.

The case was argued in November, 1875, and reargued in January, 1876.

*R. H. Dana, Jr. & C. P. Thompson,* for the plaintiffs.

*S. B. Ives, Jr. & F. Goodwin,* for the defendant. 1. The policy on the W. J. Dale having expired long before November 30, 1872, the acts done on that day cannot be construed to extend the old risk, irrespectively of the inability of the secretary and president to bind the company by such acts. This furnishes a good illustration of an impossible contract, of which instances are many. See Leake on Contracts, 356, 360. That which does not exist cannot be extended.

2. The officers had no power apart from the impossibility. This is a mutual company, and whatever power they had was derived from the by-laws. The only by-law touching the matter is the 34th. This provides that "the policy of any vessel insured in this office, however, in case of the non-arrival of such vessel, November 30, at 12 o'clock, noon, may be continued until her arrival in Gloucester. Application for the extension of such policy being made by the parties insured, the directors to decide how much extra premium shall be charged and paid by the in-

---

March next ensuing, when insured by the season, but the directors may insure vessels so employed by the trip or voyage, and for such trip or voyage a premium of five per cent. shall be charged; one half of one per cent. for all vessels employed in the Bay of Islands fishery, and sailing from Gloucester on or after October 1, at 12 o'clock, noon; and one half of one per cent. for any vessel engaged in the Bay of St. Lawrence fisheries, Seal Island or any fisheries east of Cape Sable, which have not arrived in Gloucester Harbor on or before October 15, at 12 o'clock, noon, or for any vessel engaged in George's fishing after October 15, at 12 o'clock, noon; and one half of one per cent. extra premium on any vessel sailing on a fishing voyage to Seal Island grounds, or any fishing grounds easterly from Cape Sable, between October 31 and November 10, at 12 o'clock, noon; but no vessel shall be held, under the above rates, to pay more than one per cent. extra premium between October 1 and November 30. The policy of any vessel insured in this office, however, in case of the non-arrival of such vessel November 30, at 12 o'clock, noon, may be continued until her arrival in Gloucester. Application for the extension of such policy being made by the parties insured, the directors to decide how much extra premium shall be charged and paid by the insured for such extension.

sured for such extension." As this vessel was not " insured in this office " in November, 1872, and had not been there insured since the preceding January, this by-law is no authorization to the president or secretary, or both, to extend or continue or renew any policy that had expired. The by-law does not contemplate the extension of any but an existing insurance. To confer such power upon the president or secretary outside of the by-laws would be to impose upon the members of this mutual company a burden those members had not authorized even the directors to impose, and a kind of a risk that those members, in entering the company, had not engaged to become liable for. No such power inheres in the officers of a mutual company, whatever may be the case with a stock company. *Brewer* v. *Chelsea Ins. Co.* 14 Gray, 203. *Baxter* v. *Chelsea Ins. Co.* 1 Allen, 294. *Hale* v. *Mechanics' Ins. Co.* 6 Gray, 169. *Buffum* v. *Fayette Ins. Co.* 3 Allen, 360. *Mulrey* v. *Shawmut Ins. Co.* 4 Allen, 116. *Evans* v. *Trimountain Ins. Co.* 9 Allen, 329. There is nothing in the fact that the policy contained on its back the printed phrase, " Expires Nov. 30, 1872," as the same printed clause was printed in the body of the policy, and was stricken out.

3. The matters relied upon by the plaintiffs cannot be construed to be a contract for new insurance ; and, if there are elements enough to authorize a jury to find a contract for new insurance, such contract cannot bind the defendant company. No terms were agreed upon. If the extension blank filled by the secretary is the evidence of the assumed contract, that is inadequate. It contains or specifies neither time, voyage, rate of premium, or amount of insurance.

The policy is a policy on a freighting voyage or on a cargo voyage, insuring the vessel for a voyage from Gloucester to Newfoundland, from thence to a port of discharge of cargo of herring at some point north of Cape Henry, and thence back to Gloucester, whereas the voyage that the vessel was upon when lost was a fishing voyage. Even if a contract was made which would insure the vessel upon the voyage described in the policy, no contract was made to insure her upon the voyage she was pursuing when lost.

There was no meeting of minds. Both parties acted under a misapprehension of facts. If there was an intention to do any-

thing, it was on the part of both to extend the old policy. Neither intended to make a new insurance. The old policy they could not extend. Moreover, each erroneously believed the old policy to be still in force. *Goddard* v. *Monitor Ins. Co.* 108 Mass. 56.

There was no consideration for any new contract. There was no agreement made for any premium. If the actions of the secretary or president or both be regarded as evidence of a promise or contract to insure, certainly no benefit appears to them or to the company, and no detriment to these plaintiffs, the promisees.

But even if there were elements enough to authorize a jury to find a contract for new insurance, such contract cannot bind the defendant company, because the president and secretary had no power to bind the company. See the 6th by-law.

This by-law neither the president nor the secretary, nor both, can depart from. It specifies the way in which the subscribers in this mutual company had agreed to contract with one another; and the president and secretary, who were merely their servants, cannot improvise or constitute any new way of their own. Their duty and obligation were to follow the by-laws; and their employers, who insured each other in this company, established a way in which they agreed to do it. This principle is fully established. See *Brewer* v. *Chelsea Ins. Co.* 14 Gray, 203.

The 6th by-law contemplates the action of the directors as an essential element to be contemplated in contracting for new insurance. Here the directors had taken no action whatever, nor could they take any, because no application was ever made to them or presented to them. This by-law contemplates an application, one to be made for the directors' approval, and the issue thereupon of a policy of insurance. But this transaction contemplated no action of the directors and the issue of no policy.

LORD, J. We think that, upon the evidence in this case, if believed, the jury would be authorized to find that the parties' minds were in accord in these particulars: the subject matter, the risk insured against, the amount, the duration of the risk and the premium. We think they would be authorized further to find that the parties did not contemplate anything further to be done by the plaintiffs: there was no note to be given, nor cash to be paid, as a condition precedent to the attaching of the

insurance proposed; nor was there, on the part of the defendant, any policy to be made or delivered; indeed, there were not in contemplation of either party any further negotiations to be had, nor any other thing further to be done between the parties in order to make the contract of insurance complete.

It is said, however, by the defendant, that the negotiation was had when both parties were laboring under a mistake of fact; and the defendant contends that such mistake, the agreement being made in consequence of it, prevents the contract from being effectual. It therefore becomes important to inquire to what the mistake, thus alleged by the defendant to exist, related. There was no mistake between the parties as to the subject matter; that being the schooner W. J. Dale; there was none as to the risk, both parties understanding that the last known of the Dale was that she was at Newfoundland for herring; there was none as to the amount, both parties understanding that it was the sum of fifty-five hundred dollars; there was none as to the duration of the risk, both understanding the risk to continue till her arrival at Gloucester; there was none as to the premium, both parties understanding that to be provided for by the by-laws of the company. The mistake, as contended, was that each party supposed that a previous risk, which the defendant had assumed, was to expire on that day, when, in point of fact, it had expired several months before. If such mistake existed, each party was equally at fault with the other. Each had equal means of detecting it. The policy which the defendant had issued lay before the company; upon the back of that policy were the words, printed in conspicuous letters, "Expires Nov. 30th, 1872." If the plaintiffs had opened the policy, it would have appeared that the risk had terminated several months before. Had the defendant referred to its books, the same knowledge would have been imparted. The jury might have been warranted in finding further that both parties rested in the belief, and both parties acted on the conviction, that the vessel was insured until the middle of January, 1873, after which date the plaintiffs were informed by an officer of the defendant company that upon examination he had found that the vessel was not insured.

Although the jury would be warranted in finding these facts, we do not see that they would be required to find them precisely as contended for by the defendant. It is the province of the jury not only to consider the actual facts proved by direct evidence, but all the facts which may be properly and legitimately inferred from such as are thus proved. It is to be observed that the only reported evidence, competent or incompetent, tending to show that the defendant was under a mistake in reference to the matter, is that of the plaintiff Dodd, who testifies that after January 15, 1873, the president of the company came to his (Dodd's) house and said that "upon examination he had found that the Dale was not insured." How far such evidence is competent to prove the fact, it is not necessary to consider; for, assuming it to be competent, and assuming it to have a tendency to prove the fact, it is to be taken in connection with all the other evidence in the case. There was evidence also tending to show that the secretary of the company was to attend to the matter and "see the entries made and the insurance effected." The jury would have been authorized to find that this was done, and that attention to the matter disclosed the facts as they existed. The evidence tends also to show that the application of November 30 was countersigned by each of the ten directors. It is true that the names were printed and were on the application at the time when made, (which is also true of the original application,) but they may be presumed to be there for some purpose. Upon the evidence as it stands, in connection with the by-law, we think the jury would be authorized to find that the directors' names were there *de bene*, and that unless notice was given according to the by-laws, within a reasonable time, their approval was to be inferred, and the signatures thus attached were then to be taken as evidence of such approval.

We think the jury would have been warranted in finding that the directors had done their duty, and that in doing it they necessarily became acquainted with the facts as they actually existed. One of the duties incumbent upon them by the by-laws was "to decide how much extra premium shall be charged and paid by the assured for such extension." If the jury should draw the inference that in the discharge of their duty the directors became acquainted with the facts, it would be competent for

them also to find that good faith upon their part required either reasonable notice to the plaintiffs as they found the facts to be, or acquiescence in the arrangement made between their secretary and the plaintiffs. Fraud would not be presumed, but acquiescence might be; and acquiescence would more readily be inferred, if non-acquiescence might suggest or imply bad faith. It is not necessarily the case of an executive officer of the company attempting to do an act in conflict with the by-laws. It is the action of the entire board of directors, who, by the by-laws, " shall superintend the concerns of the company, and have the management and direction of all things not otherwise herein provided for." There is nothing in the by-laws that forbids the insurance, under the sanction of the directors, of this vesse. against the risk insured against, either by original insurance or by extension of existing insurance.

There are other facts appearing which, in the estimation of the jury, might have an important bearing upon the question. The association is a peculiar one ; one of the provisions, quite unusual, is, that every member of the company is required to effect insurance, under the penalty of being compelled to pay a premium, though he has no insurance. This provision carries with it the right to have insurance upon such reasonable terms as should be concurred in by the subscriber to stock and the directors. There is evidence tending to show that the plaintiffs on November 30, 1872, had not exhausted their right, but that their subscription was such as to entitle them to the insurance applied for by them. These considerations, in the opinion of the jury, might have had weight with the directors in determining not to disapprove the application, regarding it in either light, as a new insurance, or as an extension of existing insurance.

We see no evidence which would forbid the jury to conclude that, when the subject came before the directors for their action in the ordinary and proper performance of their duty, they decided that, although it was evident that the plaintiffs were laboring under a mistake, they, the directors, might deem the mistake an unimportant and immaterial one, and, knowing that the purpose of the plaintiffs was to have the vessel insured, they might have thought it unnecessary to take any other action, but acqui-

esce in deeming the contract complete and the insurance effectual. In that case, we think the plaintiffs would clearly be entitled to recover, and it would be immaterial whether under the one form of new insurance, or under the other as adopting the language upon the back of the policy as continuing the former risk to that time and extending it. Without, however, discussing the evidence minutely, we are of opinion that the facts proved, with such inferences from the facts as the jury would be justified, in the absence of all other evidence, in drawing, would warrant the jury in finding that a contract of insurance existed between the parties. We do not mean to say that the jury would be required to find such a contract, but that it is a question of fact to be found by them.

Although a considerable portion of the argument of counsel on both sides was based upon the assumption of a mutual mistake as to the time when the former policy expired, we do not deem it necessary to decide whether, as matter of law, such mistake would avoid the contract, because it is hardly probable that, when the whole evidence shall be before the jury, the same question will be presented, except as modified, qualified or controlled either by the conduct or duty of the defendant. The verdict, which was ordered upon the plaintiffs' evidence alone, must therefore be set aside and a <span style="float:right">*New trial granted.*</span>